Good morning. Anne Shaver from Leif, Cabraser, Hyman & Bernstein for the Appellants. What's at stake in this case is the ability of employees to challenge employment practices that discriminate against them through a class action. Under the District Court's interpretation of Walmart v. Dukes, certification of both disparate impact and disparate treatment claims becomes nigh impossible, and the impact on civil rights enforcement generally cannot be underestimated. That is not the law of Walmart v. Dukes, as this Court can and should make clear. There are three critical issues I hope to cover today. The first is why the District Court abused its discretion in rejecting Appellants' disparate impact in pay claim. Second, and separately, the disparate impact in promotion claim, because the analyses are a little different. And third, why the District Court erred in rejecting Appellants' evidence of disparate treatment, intentional discrimination, as insufficient. So I'll turn first to the disparate impact in pay claim. The District Court abused its discretion in finding that Walmart foreclosed certification of this claim. Walmart has very limited application here because the challenged pay practice actually removes manager discretion. So as you'll recall, the challenged practice is that Microsoft groups employees into peer groups, based on a specific finding that the employees do similar work at a similar level, such that they should be evaluated against one another in a peer group. But then it separates the employees in the peer group into two pay bands or stock levels. A higher stock level in which men are disproportionately concentrated, and a lower stock level in which women are disproportionately concentrated. How was that decision made to separate them into the stock bands? Your Honor, the decision to separate them into stock bands is a function of what level they are in the company. So a stock band is assigned to an employee when they come into the company, and then a promotion at Microsoft is defined as an increase in stock level. And what policy is in place to set the level when the employee comes into the employment with the company? How is that set, the level? So the level would be determined by the hiring manager at that time. But is there a policy that the ñ if it's set by the hiring manager in his discretion, wouldn't that fall within Duke's? Your Honor, we are not challenging the assignment to stock level at time of hire. Our challenge to the pay practice is the practice of saying employees are peers for purposes of the work that they perform, but they are not peers. They are separated into separate pay tracks for purposes of pay. So in a ñ let me give you an example. In a disparate impact case like this one, the principle is you take the composition of the workforce as you find it, and you ask, does the challenge practice have an adverse impact on a protected group? So an example from a real-life case, Pappara v. Bosh's, that's a case where the court certified a challenge to the company's use of two pay scales, a higher pay scale for a store that employed mostly white employees and a lower pay scale for a store that employed mostly Latino employees. The court was not concerned with why does store A employ mostly whites and why does store B employ mostly Latinos. The facts were that they did. The question was, does this practice cause an adverse impact on Latinos? So here it's the same thing. The question for purposes of our pay claim is not, you know, why are women assigned into ñ or why are they locked into these lower pay bands. It's ñ the data tells us that they are. The question is whether Microsoft's dual pay band within peer group practice means that managers cannot give women equal pay for equal work. But under Dukes, we have to find what the policy is because the policy has to operate across the board. So that's what I'm trying to get is what is the policy that we should be looking at to determine whether or not there's discrimination on the basis of gender. What's the policy? Yes, Your Honor is exactly right. And for ñ the policy is different that we're ñ the policy that we're challenging is different for pay and with respect to promotions. It's two separate practices that we're challenging. So for pay. So for pay. For pay, what is the policy we should be looking at? We're looking at Microsoft's grouping of employees into peer groups for purposes of performance, saying that they do similar work, they should be evaluated together, but then when it comes time to pay them, they're separated into these two pay tracks, and one in which women are disproportionately concentrated in the lower pay back. It means that managers actually don't have the ability or the discretion to pay for performance. They are required to pay employees within their stock balance. So what factors lead to putting these groups into different categories? What is going on? So at the outset of the evaluation process, Your Honor, the HR department makes a determination of who's a peer. Right. So that's a function of the company, says these folks are peers. And the peer groups ñ And you don't challenge that? No. No, Your Honor. Okay. So we've got our groups. So we have our peer groups. The peer groups each have two pay bands or stock levels within them. And so the employees are evaluated against each other in the peer group, but then ñ Okay, so wait a minute. When that evaluation takes place, what are the evaluators doing? What are they looking at? Well, they're looking at the criteria ñ We're not challenging the employment evaluation criteria here. It was what, how, and proven capability in the earlier time period, and it was impact in the later time period. Is there any discretionary activity taking place at that level? Sure. So managers are exercising their discretion to evaluate the employees' performance, but what they are not able to do, the removal of discretion ñ Okay, so wait a minute. Wait a minute. So when they're exercising that discretion to evaluate the employees and they come to a conclusion, then what happens? Then there's a decision as to how much each employee will be paid, and the employees are locked into these stock levels or pay bands. So the effect is that a woman might perform equally or better than her male peer, but she cannot be paid the same as him because he's in a higher pay band. May I take another shot at explaining that? Well, let me ask you this. Is there any evidence that any manager ever wanted to pay a woman at the higher rate, at a higher level, and couldn't? Yes. I believe that happened to our named plaintiff, Ms. Mazuris. Her manager had told her that he hoped to give her a better rating, which would equal higher pay. She received a lower rating. But, I mean, the evidence that you need for this claim is in the statistics. Right. It's women are ñ the statistics tell us very clearly that women are locked into these lower salary ranges. But we have to have a policy that causes that. That's the disconnect that I'm having is I don't necessarily disagree that the statistics are there, but Dukes tells us that there has to be a policy that has resulted in that disparity that we can say applies across the board to every decision that's made. That's where I'm having a disconnect. Yes, Your Honor. So there is a policy that we challenge with respect to promotions, and that is, you know, the reason that why women are underpromoted in lower stock levels. So are we ñ So I can turn to that. How about pay? I'm still not there in terms of pay. I just ñ I don't feel like there's a policy that's been pointed out. Is there something in the record that you can point us to that we can look to, to say this is the policy that leads to women being banded at a lower stock band than men? Where in the record can we look and find the policy that causes this discrepancy? Let me try to clarify. The pay claim is not challenging why are women in lower stock bands. The pay claim is challenging the fact that managers have to pay peers unequally for equal work. It's challenging the fact that Microsoft has these peer groups, but then within the peer groups managers cannot pay equally for equal work because of the corporate policy. Where is that policy in the record? Your Honor, that is in the district court's opinion and it's in its explication of how the calibration process works at Microsoft. It notes which stock bands are in which peer groups and explains the way that this operates. So this is just like the Fourth Circuit's opinion in Scott v. Family Dollar Stores. There the court said it's certified a case challenging the use of mandatory salary ranges where women were disproportionately locked into lower salary ranges because of prior discrimination. The court found that's a common question that's suitable for class treatment. It's also, as I've explained, I think like the dual pay scales at use in Para v. Bosh's. So the problem is the disconnect between Dollar Store and what we have here is how the women get into those lower stock levels. And so I think what Judge Ronson's saying, where's the policy that places these women in the lower stock levels that puts them lockstep then and prevents them from getting, they may get equal or better ratings in the peer groups, but then the impact is that they're in this lockstep because of their stock level. Well, I would say, I think that the court in Scott v. Family Dollar Stores said women are in lower salary ranges because of, quote, prior discrimination, unquote. And that was its inquiry. I mean, the question before the court there in terms of the mandatory salary ranges was not, why are they in lower salary ranges? The fact was that they were, and the company used them, and the court said that's a common question. And I think similarly here, I mean, in Para v. Bosh's, right, the court was not concerned with why does this store employ whites and why does that store employ Latinos. It did. Those were the facts. And the facts here are women are in lower stock ranges. And this corporate policy, this requirement by Microsoft that managers pay employees who are peers, according to stock level, causes a disparate impact on women. It causes them to be paid less than their male peers. So I'll turn. What's the language in Scott that you're relying upon to support the argument that there was a policy here? What was the policy in Scott that the Fourth Circuit referred to? There were several policies that the Fourth Circuit looked at there. There was a headwinds policy. I think that there were challenges to some criteria, but there was also a challenge to the mandatory salary ranges that the court referred to as existing because of prior discrimination. And on rebuttal, I can bring, Your Honor, that pin site if you'd like. Okay. Thank you. Sure. Turning to disparate impact in promotions, because I think this is a bit of a different analysis, Walmart does not foreclose class certification here either. Our claim and our evidence is different than in Walmart. There, the plaintiffs challenged the practice of allowing managers to exercise discretion. Here, we challenge the company's use of criteria that do not meet the requirements of the EEOC's guidelines and the SIOP principles. So the record here shows that Microsoft actually engaged specialists to study the jobs in the class and to document the knowledge, skills, and responsibilities that are required for each position. But then, when it came time for the promotion process, it designed a promotion practice where it told managers, You need to use these three criteria that are not at all anchored in those documented job requirements. And it's that anchoring that is required under the professional standards applicable here, and that is the common answer to the question, Why was I disfavored for female engineers at Microsoft in promotions? And it's a practice of Microsoft not to require that linking or that anchoring, which can be remedied on a class-wide basis. In fact, the company has already done most of the work it would need to do to make that remedy. The big picture— Let me ask you, so if you create that, or if you establish that anchoring, how does that then play out in the evaluation process of these three criteria that you just referred to? Right. So for the promotion process, Your Honor, the manager would need to define why the three criteria, which is business need, employee readiness, and so forth, why those are linked to the actual job requirements. So I could give you a real-life example if that would be helpful. Sure. So let's take a program manager in engineering. So at a level two—and this is just one of the many requirements that are documented in these extensive profiles— the level two must create design options for feature areas. The next level up must be able to do that, but also features that enable scenarios. And the next level up must be able to define scenarios that enable customer and business themes. So the manager would need to say, there is a business need for a senior here because I need somebody who can define scenarios for me. And the employee has demonstrated her readiness because I have seen her define scenarios at X, Y, and Z times. That's the type of anchoring or linkage to actual job requirements that the EEOC's uniform guidelines and the SIOP principles require. And that is what Microsoft has not done here with respect to the class as a whole. It's the common answer and the common remedy. Okay. May I turn, Your Honors, to disparate treatment? Yes. Okay. Here we contend that the district court made a legal error in applying the wrong standard to the disparate treatment claim. So the court fully discredited appellant statistics because it found that the analysis did not conform to the level of decision-making of the challenged pay and promotion practices. That was a legal error. The law does not require disparate treatment claimants to tie their statistics to a specific employment practice. The purpose, rather, is to show a pattern of decision-making that's sufficient to raise an inference of discrimination. And here, where our intentional discrimination claim is not about individual managers making discriminatory pay and promotion decisions, it's about senior corporate leaders knowing that there is an adverse impact on women, knowing that women are underpaid and underpromoted, and failing to remedy it. So what level are you talking about these senior-level managers? The C-suite, Your Honor. Okay. Because I think what the district court said, it has to be a manager-to-manager analysis, right? So I was unclear. What do you believe the district court meant by a manager-to-manager analysis? Well, the district court discredited the statistics because he found that it's managers who are making pay and promotion decisions, so you have to look at a manager-by-manager basis. Right. So I'm confused just because there's so many managers involved in the decision-making, right? Yep. So as I understand it, it's sort of the direct manager that comes up with these evaluations and a recommendation. Then there's the manager of the managers who take those and then basically finalizes them, and then it goes up to these four EVPs who then approve, right? And it appears to be, I don't know, more of a rubber stamping. There's not a lot of change that's done at that level. So which level are you talking about? What we're talking about in our intentional discrimination claim is that the leadership of the company, the CEO, the C-suite, the head of HR, people who are in a position to make policy changes, were aware that women suffer bias, serious bias, at Microsoft and did not remedy it. And so the district court's preoccupation in the statistical analysis with the level of decision-maker is not relevant when that is the claim. When the claim is that the most senior levels of the company knew and failed to remedy, aggregated statistics are absolutely relevant circumstantial evidence. I'm not contending the district court had to find them persuasive on the merits, but at Rule 23, to discredit them entirely because he tied them to, you know, because of this manager-by-manager analysis was a legal error. Isn't that what the Fourth Circuit said was important? That it's crucial that it's higher-level managers that are making the decisions as opposed to lower-level managers? That was with respect to the application of vague criteria that do not constrain managerial discretion. So that's not the claim or the theory that we're advancing here. You know, that was with respect to criteria like, you know, something like the employee works well with others or something like that. The Fourth Circuit said, you know, if you have that type of vague criteria, it's important that you have just a few managers who are making the decisions because that's one way. I'm sorry? Then it can be a policy. That's one way of a common mode of exercising discretion. But, Your Honor, here with our intentional discrimination claim, what we're saying is this was a company with a very serious problem and leadership knew about it. I mean, their own pay equity audits that they did every year were ridiculed by employees for their illegitimacy. Employees came forward and e-mailed the CEO and HR scores of e-mails saying this doesn't pass the common sense test. We have the federal government investigating a population substantially overlapping with our proposed class here, finding systemic pay and promotion violations, notice of which went directly to the CEO. And what happened? That's not in the record, Your Honor. That is a loose deal. I can't. Okay. I let you go over substantially, but I'll give you some time for rebuttal. Thank you, Your Honor. Good morning. Lynn Hermley for Respondent Microsoft. The court started the morning focused on the standard in our first case today, and I'd like to mention it now because it is so important. Under your clear precedent, the standard that you're looking at today is not just an abuse of discretion, but a clear abuse of discretion based upon a strong showing that the plaintiffs have made, that the appellants have made, and specifically that's limited to whether this district court, in the 50 hours it spent preparing for the class certification hearing, and in its very thorough and reasoned 68-page opinion, incorrectly selected or applied the Rule 23 criteria. And that is plainly not the case here. Well, if there was an error of law, then. Yes, if there were an error of law. Abuse of discretion. But the appellants do not identify an error of law or a clear error of law. Their argument – Well, they say that the district court just likened this case to Duke's. The district court – And they say, no, this is different. The district court clearly did not do that, Your Honor, on the plain reading of the opinion. Well, he emphasizes considerably discretion, the use of discretion at all these levels. He does. And when he does that, he's talking Duke's Walmarts versus Duke's. He certainly is correct that this case – And we just heard a presentation that steps away from that. But the appellants cannot do that with a straight face, Your Honor, in light of their expert's opinion. What the district court considered and applied was Dr. Ryan's opinion. Dr. Ryan, the appellant's expert, who made extremely clear that the process plaintiffs have been challenging, not the new one in stock levels that appeared at the class certification hearing for the first time, but the one that they had pled and briefed, the calibration process, was not only imbued with discretion but that it was extraordinarily varied, both in the selection of employees that were compared, in who attended the calibration meetings, what they brought with them to the meetings, what was available for them to consider at the meeting, what criteria were considered, how they were weighted, and what the decision-making process is. Can we get into the decision-making process? I'm sorry to interrupt. Certainly, Your Honor. So on the disparate treatment analysis, so the district court then, citing Duke, said we have to look at a manager-by-manager disparity. What was meant by manager-by-manager disparity? It was a little different than that, Your Honor. In the disparate impact case, the district court said when the decisions are made at the managerial level, that is the area we look at for statistics. But the court also said a level above that, the team area, might be appropriate as well. And that correctly and properly reflected the calibration process. So in the disparate treatment section of his opinion, Judge Robart considered whether the plaintiffs had, with their statistical, anecdotal, and other evidence, showed a general policy of discrimination that pervaded the entire company. Which is the correct test under the clear law. Didn't actually he look at it on the direct manager level with regard to that? So wasn't he actually really looking at it at the merits at that point? No. He was doing the rigorous analysis, which Dukes tells us, and Dukes' progeny, and actually its predecessor cases, tell us must be done at the class certification level. The court was determining whether plaintiffs had met their burden to show substantial evidence of that policy of discrimination. So he wasn't moving ahead to say whether or not this had occurred. He was examining, as he was required to do, with rigor, whether the substantial evidence of a general policy of discrimination occurred. Right, but in looking at substantial evidence, he, of course, I mean both sides provided a lot of statistical evidence, right? And the statistical evidence, was he not critical of the plaintiffs for not showing this by manager-by-manager basis? What he did was apply what the court told us in Dukes, which is that the proper level is the decision-maker level. And where the evidence, including much of plaintiff's evidence, was that the decisions get made at the manager level, and then perhaps at the team level they may be reviewed, but above that they are not made. And so he was critical for the plaintiff's failure to meet the Dukes mandate of statistics at the decision-maker level. Well, isn't that erroneous, though? He's looking at it at the direct manager level, and in fact there's substantial evidence from your own clients with regard to it, is that there are two distinct performance levels, and that the level managers are asked to do an assessment. This is from Chris Helps' declaration, to do a performance of their lower reports, and then these lower-level managers recommend performance ratings for each direct report on a one-to-five scale. And then it goes up then to people get referred to by different names, but I know this partner level who then has final approval and looks at all of these things, and adjustments are made. And then it goes up to the four EVPs. Is that not correct? Eventually, Your Honor, the decisions are reviewed by four EVPs. That's like saying your boss's boss's boss's boss. Correct. But they are only reviewed at that level for budgetary reasons. Right, so it's more of a rubber stamping and just seeing if it's out of line in terms of the money. I mean, if somebody says he should get a billion dollars for a performance bonus, clearly that would be out of it. It's not even that. It is the decision within the budget that the EVP has. The decisions are made, and there is no error whatsoever. The decisions are made, according to the plaintiff's theory, as was pled and briefed, in the calibration process. A manager would assess, for example, Ms. Masuris's manager initially assessed her as a one. In the process, that was lowered to a two. And the process involved various groupings of various managers looking at the relative contribution of the employees they were calibrating in that process. And Dr. Ryan tells us that the groupings within that process, as well as what was done within that process, was extraordinarily varied. This is not a case like PARA in which there is a store scale of pay which is applied to a certain store. It is a situation in which managers are using their discretion, making decisions, and evaluating relative contribution. There was no error in the court telling us that at the team level, at least, the statistics should be applied. What the plaintiffs chose to do was apply the statistics at the EVP level where decisions clearly were not being made but were being ratified. They were ultimately approved, yes, but they were not made there, and that was the judge's criticism of the statistics, which is language directly from the Supreme Court's opinion in Dukes, that the statistics must apply to the decision-making level, which, of course, makes sense because if they're not, they don't accurately reflect whether or not there's a disparity. Counsel, in your view, what is the policy that's being challenged by the plaintiffs? Well, the policy that was pled. Well, today, as we sit here today, what is the policy that's being challenged by the plaintiffs? And please don't say clearly because very little is clear about this case. That's true, Your Honor, and there's a reason it's not clear, and that's because it only showed up after three years under a shifted theory at the certification hearing. But what I have just heard is that the appellants are now arguing. At the district court level, what was being argued? What policy was being argued at the district court level? What was pled and briefed was the calibration policy. That is a policy, widely varied, in which managers review the employees. Okay, today they're saying they're no longer challenging that, right? That's no longer the policy that's being challenged. It was unclear to me, but the argument seemed to be that I'm now focused on stock level, never pled, briefed, or argued clearly, but there are...  I apologize, Your Honor. It's clear in this case to me, so when you say clearly, it's not resonating. My clearly was meant to say we haven't seen it before, so it's a matter of time. But you say that a lot. You've said that a lot when you're arguing. I won't say it again, Your Honor. What the plaintiff argued, what the appellants argued, was that the stock levels in place at Microsoft somehow caused a disparate impact. The reason there is so much confusion around it is that there is not a single piece of evidence to support it. There is no showing, for example, that Ms. Messuras was grouped with people at a higher level. There is no showing that she had the same duties as anyone at a higher level. In fact, the evidence was that she did not, that she had a unique job, and when I deposed her, she told me she was unaware of anyone else who had the same duties. I guess my confusion in this case is generally we have a policy, a test, or a rating system, or something discreet that we're looking at to determine what effect this policy or this method or this tool had on the outcome. And that's what I'm kind of grappling with in this case, that I don't see anything pinpointed precisely other than the calibrations that we can look to to say, this is the Microsoft policy that we have to examine to see if it resulted in these gender inequities. That's kind of what I'm grappling with. What do you see as the tool, the policy, whatever it is that is being challenged in this case? Is there one discreet policy that's being challenged in your view? What has been challenged from early on, it shifted originally, but it's been challenged for roughly three years is the calibration policy. But setting that aside, is there anything else? Because they said they're not challenging the calibrations. What else is there that could be challenged as a policy that ends up in these stock levels? What I've just heard appellants argue is that in comparing employees, which should take us back to calibration, but isn't being discussed that way, is that Microsoft has stock levels. It essentially has pay bans. And the appellant is now saying something about those pay bans is causing a disparate impact. But because no evidence whatsoever was provided to you to support that theory, no showing was made that a single person suffered a pay disparity. And certainly nothing was presented to this Court to show that there was a common mode of injury that the entire class suffered from this policy. There is no plaintiffs have failed to make their burden. Let me just ask you, did I understand counsel, your opposing counsel correctly to say that those two bans, she says they're within a, that there are two bans in play at any given time. No, what I believe. And that you can't get out of those bans. No, that is completely incorrect, Your Honor. If that was your understanding, I believe either she misspoke or you're misunderstanding. No, I didn't understand it. The plaintiffs are challenging for their pay ban, for their pay claim, bans 59 through 67. For the promotion, it's a narrow set of bans. Employees are hired into a ban and move up with promotions into higher level bans. Counsel drew a distinction, though, between pay and promotion. What I think she was trying to articulate is that there is a calibration meeting. I'm sorry, but it is a calibration meeting in which managers compare employees at similar levels. So the employees are discussed in a large meeting, can be large, can be small, very significantly. And then a decision is made with a pay decision within the employee's pay band unless the employee is being promoted. And that process, that discussion, is called calibration and later people discussions. Do the pay decisions and the promotion decisions, do they happen at the same time? Are they linked? They are linked often. There is often a promotion discussion in the calibration meeting and then there are some promotion decisions that get made not within the same time of the pay analysis, but at various other times. For example, if I were to say to Microsoft, Twitter has offered me a huge amount of money, they might promote me in an off-cycle promotion. But there is a discussion at the same time often between the two. And that is typically a discussion at the calibration meeting or later the people discussions. Is there any other method of making assignments to the stock band other than the calibration meetings? Hiring, Your Honor. Employees are hired into stock bands, that is obviously discretionary. And then employees are promoted into stock bands. There are no other ways I can think of, I suppose you could be demoted out of a stock band with bad performance, but the heart of the issue are decisions made to hire you into a band and to promote you into a higher band. So what the district court seemed to say is that within that little, we just went over it, is that discretion seems to permeate what is going on. Not just the district court, but the plaintiff's expert. The district court cited the plaintiff's expert, Dr. Ryan, but that is what Dr. Ryan says, Your Honor. She says there is too much discretion, that the meetings themselves are discretionary in how the groupings are made. Dr. Ryan argues that the process that plaintiffs seem to be talking about should be standardized and is not. She tells us that the weighting is not what plaintiffs want, because it's widely varied, because Microsoft trusts its managers to apply the correct criteria within their discretion for teams that are very widely varied and do different things. But opposing counsel said just the opposite, that discretion is taken away by use of these bands. What I think she is saying, and it's a standard process throughout business, is that there is a pay grade for a job. And the fact that I do spectacularly well doesn't mean that my boss can put me in an upper pay grade without a promotion. When you've reached the top of your pay grade, you've reached the top of your pay grade, regardless of how spectacularly you do it. Unless an exception is made, it's the general process. But the reason it's so confusing is that there was no evidence ever to develop it, Your Honor. It showed up at class certification. And despite the fact it showed up and the plaintiffs had no evidence to suggest it impacted a single person, no evidence to suggest that either of the named plaintiffs were compared to someone who did the same work. In fact, quite the reverse. There was no evidence that this was a common practice. In fact, what was clear from Dr. Ryan's report, which we did not rebut, is that the groupings were made differently throughout the class. The managers decided things differently. It was all extraordinarily varied. So there is a reason for such confusion. So counsel just said, shifting for just a moment to the disparate treatment claim. Just a moment ago, she argued that the focus is at the, she called it the C level or the executive level of the company. And that the claim is that these statistics show that women just do not do as well as men. They know it. They know it. And that's what we're using these statistics for. What's wrong with that? It's completely false as a matter of law and fact, Your Honor. Well, now that's a very bold statement. I stand behind it. The rule of law is that for a disparate treatment claim of the type alleged here, there must be a general policy of discrimination that pervades the entire company. That is the clear law. Right. So they submitted Dr. Farber's study. Is that correct? They did. All right. And so the district court then criticized it because it didn't look at below the EVP level. The district court held that it wasn't at the decision-maker level. But let's accept it for a minute, Your Honor. Yes. Okay. What Dr. Farber tells us is that for 96 percent of the class, he found no pay or performance disparity. Ninety-six percent of the class. That's assuming he did it at the right level. And that means that for the vast majority of class members, there is no pay and no performance disparity. And what that means is we simply do not have a common injury. How could we have a common injury when the expert who is looking at our performance and other processes tells us in 96 percent, I see no, he was very clear. He could not find a single performance or pay disparity linked to the process that plaintiffs had alleged, the calibration process. In stark contrast to what he found in Chen Oster, where he not only found significant disparities linked to the performance assessment process, he found pay disparities that were extraordinarily significant. And what he told us here is, I find no disparity in the performance or rewards outcome, meaning the pay that comes out of the performance assessment process. So how can there be a common injury throughout the class when Dr. Farber is telling us, in 96 percent, 95 percent, depending on the argument, there is not a performance disparity or reward disparity. So your argument is, even if the district court got it wrong and was holding them to saying, he should have shown me an analysis of manager by manager disparity, which I didn't understand if he meant direct or team, but you're saying, put that aside and say this was the correct, he should have, even if you remand it back and say EVP level is fine, the evidence doesn't support such a conclusion. Well, a remand saying EVP level is fine would be incorrect under Walmart, which tells us we have to look at the decision-making level. But even if the statistics were to be wholly accepted, then they show the opposite of a common injury. They show a common lack of injury, because Dr. Farber himself found no pay or no performance or reward disparity. The one thing he seized upon was a small number of promotions, which under his model, he believed, should have happened at a different time. And because that is such a small pocket, it's not common. Exactly right. I've let you go quite a bit over the allotted time. If I could just say one thing, Your Honor, to sum up, and that is what the plaintiff started with. What's at stake here is the employee's ability to challenge pay disparity. Nothing in Judge Robart's decision does that. We have a putative class of employees who are software engineers, program managers, folks with high resources. We have two named plaintiffs who are able to proceed with their claims. Certainly other employees could join them. Nothing about Judge Robart's decision, which is extraordinarily well researched and thorough, prevents any employee from challenging an employment decision. Thank you. Thank you very much. We'll put two minutes on the clock for rebuttal. Thank you, Your Honor. First, Judge Rawlinson, as to your question about the Scott opinion, at 733 F3rd 110, appellants challenge at least four company-wide policies. First, appellants assert the existence of a mandatory salary range for store managers set annually by the corporate headquarters, which locks in prior disparities between male and female store managers' compensation. Let me just give another shot at explaining this process, this policy that we're challenging. It's as if my law firm says all associates are peers, and they are all performing the same work, and they're all subject to the same standards here. We evaluate them, but then when we pay them, some of the associates are in a pay range A that's higher, and some of the associates are in pay range B that's lower. So an associate who's in pay range B might be performing just as well or better than an associate in pay range A, but is going to get paid less because they're locked into that lower pay range for that compensation cycle, for that year. And that is causing a disparate impact on women here. And as for what the evidence of that is. Well, the remedy is that Microsoft needs to pay employees who it says are peers, needs to make them eligible for the same rate of pay. That's the common class-wide fix to this problem. You could eliminate the pay bands, but I don't think that's really not the key element. The key element is if you're a peer, you need to be eligible for the same rate of pay. So peers need to be in the same pay ranges. Peers need to be in the same pay bands. The calibration system is the process by which employees are evaluated, paid, and promoted. So the processes that were challenging for the pay and promotion decisions fall under calibration. You don't need to get rid of calibration entirely. You need to fix the specific deficiencies in pay and promotion. So the specific deficiency to fix with pay is that employees who are peers of each other per the company's own finding that they're peers need to be eligible for the same rate of pay. And for promotions, it's that no evaluation of competency. So that's what I thought the calibration system was to determine how much they're contributing to the organization, how they play well with others, all of these factors. So you're saying that those factors should not be part of the equation? No, not at all, Your Honor, not at all. So calibration is first that performance evaluation that you're just referring to. So it is once HR has said, these are your peer groups. Then the first step is evaluating their performance. And as we know, there's no gender impact in the evaluation of the performance. It's the next part of the calibration process, the pay, where the gender impact comes in. How is that, I guess that's where I'm, you're losing me. How do you go from the calibration to the pay? How is that, what's that process? The managers, your pay is determined by your performance rating and your stock level. So the manager takes the performance rating that they have assigned to the employees, and then based on what stock level they're in, that's what you get paid. And that's why the fact that women are locked in to lower stock levels than their male peers. But I thought this, so as Counselor just said a minute ago, I thought we're just dealing with two particular stock, three or four particular stock levels in this case. No, Your Honor, let me explain. There's two stock levels in each peer group. But the stock levels that are an issue in this case are 59 through 67 for the pay claim. So that's three or four separate peer groups. Right. So may I speak to aggregated statistics? Would the Court like to hear about that? Go ahead. One last comment, and that's, we'll have to end it after that. Sure. Counsel has vastly misrepresented the statistics finding here. Our expert did not find that 96 percent of women at Microsoft experience no discrimination. What our expert did was to control for all of the legitimate factors that could determine an employee's pay. Their profession, their discipline, their title, where they worked, the year, everything, and find that women were paid less than men to a statistically significant degree, a strongly statistically significant degree. Courts regularly accept a standard deviation of two as probative of discrimination. Here we had over 21. We had at least a 6 percent pay difference in the model that he advocated, and two and a half under the model that Microsoft said was more appropriate. But we're talking about real money here either way. Under the most conservative approach, it's over $100 million. So the point about aggregated statistics is that when you have a disparate treatment claim that talks about what the highest levels of the company knew, those aggregated statistics are relevant circumstantial evidence. They're also relevant evidence when you're challenging a corporate policy that applied throughout the class, not on an individual decision-maker-by-decision-maker basis. So for both the disparate impact and the disparate treatment claims, we would submit that our aggregated statistics are probative evidence and the district court was wrong to reject them. Thank you very much for your time. Yes, Your Honor, I'm glad you raised that. I think that the adequacy question has already been addressed by this Court in Staten v. Boeing. In Staten v. Boeing, the Court said where the plaintiffs allege a general company policy of discrimination and the remedy applies to the class as a whole, there is no conflict between supervisors and subordinates in the same class, and the same thing is true here. We have no specific allegations by class members of discrimination against other specific class members. We don't have supervisors who are personally liable for the systems here. We don't have any of the issues that other courts have found create a conflict. I think that adequacy is actually quite a common-sense call here, Your Honor. Thank you.
judges: Paez, Rawlinson, Kobayashi